## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BECKLEY DIVISION

| | | |
|---|---|---|
| **HENRY PERSINGER,** | ) | |
|     **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 5:03-0618** |
| | ) | |
| **THOMAS MCBRIDE, Warden,** | ) | |
| **Mount Olive Correctional Complex,** | ) | |
|     **Respondent.** | ) | |

### PROPOSED FINDINGS AND RECOMMENDATION

On July 3, 2003, Petitioner, an inmate at Mount Olive Correctional Complex [MOCC], and acting *pro se*, filed a Petition Under 28 U.S.C. § 2254 for Writ of *Habeas Corpus* By a Person in State Custody.[1] (Document No. 1.) Petitioner alleges the following grounds for *habeas* relief:

1. The Court violated the Petitioner's constitutional right to due process by disregarding newly discovered evidence relating to the qualification of Dr. Breitinger.

2. The trial Court's failure to allow Petitioner to introduce evidence of specific acts of prior sexual abuse by others constituted a manifest injustice, violating Petitioner's right to a fair trial guaranteed by the Fourteenth Amendment to the United States Constitution and by Article III, section 10 of the Constitution of West Virginia.

3. The State's failure to disclose exculpatory evidence prior to trial denied Petitioner his right to due process of law under the Fourteenth Amendment to the United States Constitution and Article III, section 10 of the Constitution of West Virginia.

(Document No. 1, p. 7.)

By Standing Order filed on July 3, 2003, this matter was referred to the undersigned United

---

[1] Because Petitioner is acting *pro se*, the documents which he has filed in this case are held to a less stringent standard than if they were prepared by a lawyer and therefore, they are construed liberally. *See Haines v. Kerner*, 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

States Magistrate Judge for the submission of proposed findings of fact and a recommendation for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (Document No. 3.) Pending before the Court is Respondent's Motion for Summary Judgment. For the reasons stated below, the undersigned has concluded that Respondent's Motion must be granted.

**PROCEDURE AND FACTS**

On June 28, 1994, the Grand Jury of Jackson County, West Virginia returned a Six-Count Indictment against Petitioner, charging him with two counts of sexual assault in the first degree in violation of West Virginia Code § 61-8B-3 (Counts One and Two); two counts of sexual abuse by a parent, guardian, or custodian in violation of West Virginia Code § 61-8D-5 (Counts Three and Four); and two counts of incest in violation of West Virginia Code § 61-8-12. (Document No. 8, Exhibit 1.) On December 1, 1994, after a trial by jury in the Circuit Court of Jackson County, West Virginia, Petitioner was convicted of two counts of sexual abuse in the first degree (Counts One and Two) and two counts of incest (Counts Five and Six). State v. Persinger, Criminal Case No. 94-F-17 (Cir. Ct. Jackson Co. Mar. 1, 1995). (Document No. 8, Exhibit 2.) Petitioner was found not guilty of Counts Three and Four. (Id.) The Circuit Court sentenced Petitioner to an indeterminate term of imprisonment of 15 to 35 years each upon Counts One and Two and 5 to 15 years each upon Counts Five and Six. (Id., Exhibit 3.) By Order entered March 1, 1995, the Circuit Court ordered that the sentences imposed on Counts One and Two run concurrently with one another, the sentence upon Count Five run consecutive to the sentences imposed on Counts One and Two, and the sentence imposed on Count Six run consecutive to the sentence imposed on Count Five. (Id.)

On October 2, 1995, Petitioner, by counsel, appealed his conviction and sentence to the

Supreme Court of Appeals of West Virginia [SCAWV], raising thirty assignments of error.[2] (Id.,

_____

[2] Petitioner raised the following assignments of error:

    1.  The Court erred in denying Defendant's Motion to Suppress his written statement.

    2.  The Court erred in granting the State's Motion in Limine over Defendant's objection.

    3.  The Court erred in denying Defendant's Motion in Limine.

    4.  The Court erred in denying Defendant's Motion to Compel Exculpatory Evidence and Motion to Continue.

    5.  The Court erred in not granting and requiring the State to fully comply with Defendant's Motion to Compel Exculpatory Evidence.

    6.  The Court erred in denying Defendant's Motion to Determine Competency of Witnesses.

    7.  The Court erred in ruling upon Defendant's Motion to Determine Competency of Witnesses without first allowing Defendant to adduce the testimony of the proposed child witnesses to the Court out of the presence of the jury.

    8.  The Court erred in granting the State's motion based upon the case of *State v. Jones* over Defendant's objection.

    9.  The Court erred in granting the State's motion based upon the case of *State v. Barker* over Defendant's objections.

    10. The Court erred in refusing to grant Defendant's Motion to Strike for Cause from the jury panel juror Barbara Liegey and Sandra Reed.

    11. The Court erred in ruling that State's witness Keitha Graham, should be recognized as an expert in sexual abuse counseling.

    12. The Court erred in ruling that the State's witness, Keitha Graham, should be recognized as an expert and allowed to testify in the same capacity as a psychologist.

    13. The Court erred in limiting Defendant's cross-examination of witness, Keitha Graham, regarding prior statements of witness, Vince Ray.

    14. The Court erred in allowing State's witness, Dr. Ernest Breitinger, to testify during the trial as to the identity of the alleged offender and as to the number and time of incidents, all of which were based on extra-judicial statements of the alleged victim.

    15. The Court erred in denying Defendant's Motion for Judgment of Acquittal at the close of the State's case.

    16. The Court erred in denying Defendant's Motion after the testimony of Myrtle Ray for leave to present evidence as to prior sex acts testimony regarding the alleged victim.

    17. The Court erred in denying Defendant's Motion for Judgment of Acquittal after the close of the Defendant's evidence.

    18. The Court erred in denying Defendant's pre-trial Motion to dismiss,

Exhibit 4.) By Opinion Order dated May 16, 1996, Petitioner's direct appeal of his conviction and

sentence was refused by the SCAWV. State v. Persinger, Case No. 951892 (W.Va. May 16, 1996).

Petitioner did not file a Petition for a Writ of Certiorari in the United States Supreme Court.

On May 7, 1997, Petitioner, proceeding *pro se*, filed his Petition for Writ of Habeas Corpus

---

challenging the sufficiency of the Indictment upon the grounds that the Indictment is defective upon its face, having omitted essential elements of the offenses purported to be charged therein.

19. The Court erred in instructing the jury as to any offenses that the Defendant could be found guilty on, which objections were raised by the Defendant at the close of all of the evidence, for reason that the Indictment is facially deficient, having omitted essential elements of the offenses purported to be charged therein.

20. The Court erred in giving State's Instruction Numbers 1, 2, 3, and all other instructions offered by the State all of which were given over Defendant's objections.

21. The Court erred in instructing the jury that it could convict the Defendant on three separate crimes based on the same conduct, overruling Defendant's objection thereto on grounds of double jeopardy.

22. The Court erred in allowing the State to use a chart in its closing statement, which use was objected to by the Defendant and was misleading to the jury inasmuch as it omitted essential elements of the offenses.

23. The Prosecutor's remarks during closing argument to the affect that the Defendant was hiding behind the chart that the State had placed in front of the jury were improper and inflammatory and prejudicial to Defendant's right to a fair trial.

24. The Assistant Prosecutor's statements to the jury during closing argument that Myrtle Ray wanted the defendant to be acquitted because then she would get her kids back were improper inasmuch as there was no such evidence before the jury to support such an argument and as a matter of law it is a misleading proposition that an acquittal would result in the return of the children to said Myrtle Ray.

25. The Court erred in denying Defendant's post-trial Motion for Acquittal and/or New trial and/or Arrest of Judgment.

26. The Court erred in imposing an excessive sentence upon Defendant.

27. The Court erred in denying Defendant's motions made upon imposition of sentence for stay of execution of sentence and release on bail pending appeal.

28. The verdict was unsupported by the evidence or by the greater weight of the evidence.

29. The verdict was contrary to law.

30. For such other matters apparent to the Court or that may come to the attention of the Defendant upon review of the trial transcript.

(Document No. 8, Exhibit 4.)

4

in the Circuit Court of Fayette County.[3] State ex rel. Persinger v. Trent, Case No. 97-C-0176 (Cir.

Ct. Fayette Co. June 6, 1997). (Document No. 8, Exhibit 5.) By Order entered June 6, 1997, the

Circuit Court of Fayette County transferred his Petition to the jurisdiction of the Circuit Court of

Jackson County, West Virginia, where Petitioner was convicted and sentenced.  (Id., Exhibit 6.)

After addressing the merits of each of Petitioner's claims, the Circuit Court of Jackson County

denied his Petition by Opinion Order entered October 29, 2002. State ex rel. Persinger v. Painter,

Case No. 97-C-53 (Cir. Ct. Jackson Co. Oct. 29, 2002). (Document No. 8, Exhibit 7.) Petitioner, by

counsel, J. L. Hickok and Paul R. Stone, West Virginia Public Defender Services, appealed the

---

[3] Petitioner raised the following grounds for *habeas* relief:

1.   Petitioner asserts he was denied his right to a fair trial when the trial court allowed the testimony of the State's witnesses as an expert, which exceeded permissible limits.

2.   Petitioner['s] constitutional rights to a fair trial were denied when the State and/or its agents failed to disclose the requested exculpatory evidence.

3.   Petitioner was denied the effective assistance of counsel which denial contributed to his conviction and, consequently, the right to a fair trial, and due process of law.

4.   Petitioner[ ] contends his constitutional rights were violated under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article III, Section Ten of the West Virginia Constitution were violated as a result of the Prosecuting Attorney in his closing argument's, misstating crucial facts and stating as facts not in evidence and inflaming the jury.

5.   Petitioner contends the State of West Virginia failed to meet the burden of proof required by law, in which the proof is wholly circumstantial in nature, this is in direct violation of the Fourteenth Amendment to the United States Constitution and under Article III, Section 10 of the West Virginia Constitution.

6.   Petitioner assert[s] that he was denied a fair trial when the State's witness took the stand as an expert witness who was disbarred by the State of New Jersey and the State of West Virginia Medical Board.

7.   Petitioner asserts he was denied a fair trial due to the cumulative effect of numerous errors committed during the trial of the Petitioner.

(Document No. 8, Exhibit 5, pp. 11-32.)

Circuit Court's denial of his *habeas* Petition on March 28, 2003, which petition for appeal was refused by the SCAWV on June 25, 2003.[4] <u>Persinger v. Painter</u>, Case No. 030577 (W.Va. June 25, 2003).  (Document No. 8, Exhibit 8.)

 Petitioner filed his instant Petition on July 3, 2003. (Document No. 1.) By Order entered on October 24, 2003, the undersigned directed Respondent to show cause why Petitioner's Petition should not be granted. (Document No. 5.) In response to the Court's Order, Respondent filed a Motion to Dismiss for Failure to File within the Prescribed Limitation Period and Memorandum in Support Thereof. (Document No. 8.) On August 16, 2004, the undersigned entered Proposed Findings and Recommendation that Respondent's Motion be denied. (Document No. 12.) By Order entered on September 8, 2004, the District Court adopted the undersigned's recommendation, concluding that Petitioner filed his Petition within the one-year statute of limitation under 28 U.S.C. § 2244(d)(1)(A), and referred this matter back to the undersigned for scheduling of further proceedings. (Document No. 13.)

 By Order entered on September 9, 2004, the undersigned directed Respondent to address the

---

[4] On appeal, Petitioner alleged the following grounds for relief:

 1. The Court erred by disregarding newly discovered evidence relating to the qualification of Dr. Breitinger.
 2. The trial court's failure to allow Petitioner to introduce evidence of specific acts of prior sexual abuse by others constituted a "manifest injustice", violating Petitioner's right to a fair trail guaranteed by the Fourteenth Amendment to the United States Constitution and by Article III, section 10 of the Constitution of West Virginia.
 3. The State's failure to disclose exculpatory evidence prior to trial denied Peittioner his right to due process of law under the Fourteenth Amendment to the United States Constitution and Article III, section 10 of the Constitution of West Virginia.

(Document No. 8, Exhibit 8.)

merits of Petitioner's allegations and show cause, if any, why Petitioner's Petition should not be granted. (Document No. 14.) On October 1, 2004, in response to the Court's Order, Respondent filed his Motion for Summary Judgment and Memorandum in Support Thereof with a copy of the trial transcript of Petitioner's criminal proceedings. (Document Nos. 16-17.)

On October 5, 2004, Notice pursuant to <u>Roseboro v. Garrison</u>, 528 F.2d 309 (4th Cir. 1975), was issued to Petitioner, advising him of his right to file a response to Respondent's Motion for Summary Judgment. (Document No. 18.) Petitioner filed his "Response with Objections to Respondent's Motion for Summary Judgment" on October 19, 2004, in which he states that his "petition speaks for it's self [sic] due to Constitutional Issues that was presented to this Court under 28 U.S.C. 2254 on a petition for writ of habeas corpus, that was filed in good faith on July 3, 2003."[5] (Document No.19.)

By Order entered June 21, 2005, the undersigned directed Respondent to provide the Court

---

[5] Petitioner further states his objection to the Motion for Summary Judgment because he "does not have counsel to represent his issues in a court of law properly" and because the removal of books and a change in the computer system in the MOCC library has hindered his ability to make a proper response. (Document No. 19.) The undersigned notes that a considerable period of time has passed since Petitioner filed his response on October 19, 2004, nearly eight and one half months, and finds that Petitioner had ample opportunity to supplement his response to the Motion for Summary Judgment. Nevertheless, because Petitioner has not filed a response to the Respondent's Motion for Summary Judgment, the undersigned will consider the statements contained in his verified Petition as his response to the Motion. *See Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991)("[A] verified complaint is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge.")(*citing Davis v. Zahradnick*, 600 F.2d 458, 459-60 (4th Cir. 1979)("Holding that the factual allegations contained in a verified complaint establish a *prima facie* case under 42 U.S.C. § 1983, so as to preclude summary judgment."); *see also Neal v. Kelly*, 963 F.2d 453, 457 (D.C. Cir. 1992)(Finding that an inmate's verified Complaint under the statutory substitute for the taking of an oath, 28 U.S.C. § 1746(1), by declaring "under penalty of perjury . . . that the foregoing is true and correct,' and dating his signature, " constitutes his affidavit and may be considered in opposition to summary judgment.).

with certified copies of the transcripts of Petitioner's March 17, 1995, and July 10, 1995, hearings vouching the record in Petitioner's criminal proceedings. (Document No. 20.) On June 29, 2005, the Respondent filed the transcripts in support of his Motion for Summary Judgment. (Document No. 21.)

## STANDARDS OF REVIEW

### 28 U.S.C. § 2254

Federal *habeas* relief is available to a state prisoner under 28 U.S.C. § 2254, only if the prisoner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a)(2002); see also Sargent v. Waters, 71 F.3d 158, 160 (4th Cir. 1995). Section 2254(d) provides that when the issues raised in a § 2254 Petition were raised and considered on the merits in state court *habeas* proceedings, federal *habeas* relief is unavailable unless the state court's decision:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the United States Supreme Court stated that under the "contrary to" clause in § 2254(d)(1), a federal *habeas* court may grant *habeas* relief with respect to claims adjudicated on the merits in state court "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412-13, 120 S.Ct. at1523. A federal *habeas* court may grant relief under the "unreasonable application" clause of § 2254(d)(1) where the state court identified the

8

appropriate Supreme Court precedent but unreasonably applied the governing principles to the facts

of the Petitioner's case. Id. In determining whether the state court's decision was contrary to, or was

an unreasonable application of, Supreme Court precedent, all factual determinations by the state

court are entitled to a presumption of correctness with the burden placed on Petitioner to rebut the

presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).[6]

When a state court fails to address an issue, or fails to articulate a rationale behind its ruling,

the federal courts "must independently review the record and the applicable law; however, the

review is not a de novo review. See Bell v. Jarvis, 236 F.3d 149, 163 (4th Cir. 2000)(en banc), cert

denied sub nom. Bell v. Beck, 534 U.S. 830, 122 S.Ct. 74, 151 L.Ed.2d 39 (2001).  Rather, it is a

deferential review to determine if the state court's decision is legally and factually reasonable. Id.

The Circuit Court of Jackson County denied Petitioner's Petition for a Writ of Habeas Corpus on

---

[6] Title 28, U.S.C. Section 2254(e) provides:

(e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –
    (A) the claim relies on –
        (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
        (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
    (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

the merits; however, the Court referenced Supreme Court precedent only with respect to Petitioner's ineffective assistance claims, which are not raised in his federal Petition. The SCAWV then summarily refused Petitioner's appeal of the denial of his *habeas* Petition. The United States Court of Appeals for the Fourth Circuit has consistently held that "a summary state court decision on the merits of a federal constitutional claim is an 'adjudication' of the claim for purposes of § 2254(d)." Bell v. Jarvis, 236 F.3d at 163. Beginning with Wright v. Angelone, 151 F.3d 151, 157 (4th Cir. 1998), and continuing with Weeks v. Angelone, 176 F.3d 249, 257 (4th Cir. 1999), aff'd, 528 U.S. 225, 120 S.Ct. 727, 145 L.Ed.2d 727 (2000), Baker v. Corcoran, 220 F.3d 276, 291 n.14 (4th Cir. 2000), cert. denied, 531 U.S. 1193, 121 S.Ct. 1194, 149 L.Ed.2d 110 (2001), Bacon v. Lee, 225 F.3d 470, 478 (4th Cir. 2000), cert. denied, 532 U.S. 950, 121 S.Ct. 1420, 149 L.Ed.2d 360 (2001), and concluding with Bell v. Jarvis, the Fourth Circuit has ruled, in a variety of procedural contexts, that Federal Courts are limited to a deferential review of the result of State Court decisions.

Based upon Bell v. Jarvis, the undersigned proposes that the District Court **FIND** that the Jackson County Circuit Court's decision on Petitioner's *habeas corpus* claims was an adjudication on the merits for purposes of § 2254(d). The SCAWV, however, did not articulate the rationale behind its ruling refusing Petitioner's *habeas corpus* claims. Therefore, as to any grounds not addressed by the Jackson County Circuit Court, the undersigned proposes that the District Court **FIND** that the appropriate standard of review is an independent, but deferential, review of the record and the applicable law to determine whether the State Courts' decisions (i.e., the "results") were legally or factually unreasonable.

**Summary Judgment**

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Once the moving party demonstrates the lack of evidence to support the non-moving party's claims, the non-moving party must go beyond the pleadings and make a sufficient showing of facts presenting a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553-54, 91 L.Ed.2d 265 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 - 87, 106 S.Ct.1348, 1355-56, 89 L.Ed.2d 538 (1986). All inferences must be drawn from the underlying facts in the light most favorable to the non-moving party. Matsushita, 475 U.S. at 587, 106 S.Ct. at 1356. Summary judgment is required when a party fails to make a showing sufficient to establish an essential element of a claim, even if there are genuine factual issues proving other elements of the claim. Celotex, 477 U.S. at 322-23, 106 S.Ct. at 2552-53. Generally speaking therefore, summary judgment will be granted unless a reasonable jury could return a verdict for the non-moving party on the evidence presented. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986). If no facts or inferences which can be drawn from the circumstances will support Petitioner's claims, summary judgment is appropriate.

## **FACTUAL BACKGROUND**

On February 22, 1994, Petitioner's five-year-old niece, Amanda Ray, commonly known as "Mindy," informed her elementary school counselor, Ms. Keitha Graham, that Petitioner had penetrated her vagina with his penis and fingers. (Document No. 17, Exhibit 9, Trial Transcript, pp. 256-272.) Trial testimony revealed that Petitioner's actions took place during a period of time in which Mindy, her mother, and her brothers, Mark, Vince, and Jess, were living with Petitioner at Mindy's grandmother's house. (Id., pp. 153-54.) Keitha Graham testified for the State that on

February 22, she observed Mindy aimlessly roaming the school hallway, as if in a trance, and then shortly thereafter, becoming defiant and belligerent with her teacher, flailing her arms in the air. (Id., p. 254.) Mindy's teacher advised Ms. Graham that Mindy had been shutting herself in dark closets, rolling herself into a "beetle ball" in the hallway, and crying, and asked Ms. Graham to see Mindy. (Id., p. 255.) Mindy's behavior reminded Ms. Graham of that which she last observed from a sexual abuse victim while working in the capacity as a psychotherapist at a juvenile detention facility in Ohio, and agreed to talk to Mindy. (Id., pp. 221, 254.) Later that same day, Ms. Graham had Mindy come to her office where Mindy told her that "Uncle Henry" touched her "shina," meaning her vagina, with his "dingdong," meaning his penis, "fingers and hands," and that the touches were "inside" touches. (Id., pp. 259-61.) Mindy further told Ms. Graham that on one occasion her mother observed Petitioner on top of her and told him: "Stop that or I"ll tell Grandma. Get away from my little girl." (Id., p. 261.) Ms. Graham testified however, that Petitioner "turned around and hit her mother and said he would do whatever he wanted. . . . [and that Petitioner] just kept doing it again.'" (Id., pp. 261-62.) Ms. Graham further testified that due to her infancy, Mindy possessed "a very poor sense of time and space concepts." and therefore, could not specify a certain date on which Petitioner committed the sexual acts. (Id., p. 262.) Over Petitioner's objection, the trial court permitted Ms. Graham to offer her expert opinion that based upon Mindy's statements and demeanor, Mindy had been sexually abused. (Id., p. 272.) Ms. Graham further testified, however, that Mindy had been "penetrated vaginally and sexually abused" by someone other than Petitioner, but that she could not place the abuse within any certain period of time. (Id., pp. 272, 278.)

The State's direct examination of Mindy and her brothers revealed a slightly different version of the facts than presented by Ms. Graham. Mindy testified that she, her mother, and her brothers,

12

Vince, Mark, and Jess, stayed at her grandmother's house during Christmas, at which time she said Petitioner "put his dingdong" in her "shina" only one time. (<u>Id</u>., pp. 158, 170, 174.) Mindy was unable to identify the specific day on which Petitioner committed the sexual act, but testified that her brothers, Vince, Mark, and Jess, witnessed the act. (<u>Id</u>., pp. 173-4.) On cross-examination, Mindy stated that the sexual act occurred during the day in Petitioner's bedroom while her mother and grandmother were in the living room and her aunt was in her bedroom playing a video game. (<u>Id</u>., pp. 180-81.) She testified that she told her mother what Petitioner did and her mother neither did, nor said anything in response. (<u>Id</u>., p. 175.) Mindy further testified that Petitioner never touched her with anything other than his penis on the one occasion. (<u>Id</u>., p. 175.)

Mindy's brother Vince testified that he, Mindy, Mark, Jess, and his mother stayed at his grandmother's house during Christmas because the "gas wasn't on" at his house. (<u>Id</u>., pp. 188-89.) Vince said that while staying at his grandmother's, on one occasion when in Petitioner's bedroom, he saw Petitioner touch "Mindy's shina" with his "Dingdong" after which Mindy cried. (<u>Id</u>., pp. 190, 193.) Vince testified that he told his grandmother and mother what Petitioner did and Petitioner "whipped" him. (<u>Id</u>., p. 192.) He also said that Mark and Jess were present when Petitioner touched Mindy. (<u>Id</u>., p. 192.) After Petitioner "whipped" him, Vince stated that Petitioner touched "Mindy's shina" again with his "dingdong" and that Mindy screamed. (<u>Id</u>., pp. 192-93.) He again told his mother and grandmother. (<u>Id</u>.) During cross-examination he, too, stated that it was daylight when Petitioner touched Mindy and that his mother, grandmother, and great-grandmother were in the living room and his aunt was in her bedroom. (<u>Id</u>., pp. 195-96.) While Petitioner was touching her, Vince said that he, Mark, and Jess were in the same room on the top bunk bed working a puzzle. (<u>Id</u>.)

Mark testified however, that during the same time and while in Petitioner's bedroom, he saw Petitioner twice penetrate Mindy with only his fingers. (Id., pp. 206-209.) He said that he did not tell anyone what he observed. (Id., pp. 208-209.) He further testified that his mother told his brother: "Vince, do not testify against Henry. Don't tell them what Henry done. And Vince said okay." (Id., p. 209.)

The State also offered the expert testimony of Ernest R. Breitinger, M.D. (Id., pp. 284-302.) Dr. Breitinger testified that upon his physical examination of Mindy on March 29, 1994, he observed that Mindy was hyperactive, unreserved during the exam, and very distractible. (Id., p. 297.) Dr. Breitinger stated that Mindy "spontaneously" told him that on six different occasions "Uncle Henry touched me in my privates." (Id., p. 294.) Dr. Breitinger further testified on direct exam that he performed a physical examination of Mindy, the findings of which he described as follows:

> I would say that her initial impression upon me in the way that she was behaving was a bit unusual in the sense that she was very - - almost hyperactive, she was very distractible, very hard to keep focus on the questioning and very difficult to focus on the examination. She also seemed to be very comfortable with being examined which is very unusual with a child whom I have only met for the first time.
>
> * * *
>
> She did not seem as bashful or frightened of the experience as I would expect a normal child to be.
>
> * * *
>
> My observations of her genital area revealed a definite enlargement of the introitus, which is the opening to the vaginal area, that's the area that contains the hymen which is normally a membrane that is present at birth, at least in whole or in part. And I noticed that her hymen was completely missing and that there was some dilatation of the vagina of at least one centimeter, possibly slightly more, to approximately half an inch in dilatation.
>
> Q  When you say "dilatation," could you be more specific?
> A  That's enlargement or stretching, a widening as compared to the normal anatomic shape and size.
> Q  You said the hymen was completely missing?
> A  Yes, it was.
> Q  What again was your recollection of the size of the opening of the hymen?

14

A   It was approximately one to probably one-and-a quarter centimeters. I would say roughly half an inch; I did not exactly measure it.

Q   What is the norm considered?

A   The norm is less than one centimeter. In most cases half a centimeter or less depending on how much of the hymen is present.

Q   Was there anything else that - - you said you noticed dilatation of the opening and the absence of the hymen itself. Did you notice anything else?

A   I noticed some membranous scarred areas, we call them synechiae - 0

Q   Could you spell that for the court reporter?

A   Yes. S-Y-N-E-C-H-I-A-E.

Q   And what are synechiae?

A   Those are membranous scar tissue formations that often develop when there's previous stretching of the membrane and usually some cracks develop in the membrane or if it's traumatized in some way you may get some scarring, a slightly raised membranous.

Q   What would a common source of stretching be?

A   The most likely in this setting in examining genitals would be previous stretching or penetration of the opening, dilation of the opening by some object.

Q   Would stretching or dilation of the opening by some object cause the membranous scar tissue that you just described?

A   It certainly could.

Q   Was the area - - did it appear to have been recently stretched?

A   It was difficult to say but it was well healed and there was no sign of recent or active bleeding, no discharge.

Q   "Well healed" meaning what?

A   There was well-developed scar tissue, no evidence of redness and no evidence of recent bruising or anything that would be associated with trauma within the last three weeks.

Q   You say within the last three weeks. What would you consider - - what's the outside time limit that you believe would cause something you describe as recent trauma?

A   Normally if bruising is present, most bruises will resolve within three weeks, usually they will turn somewhat yellow and then disappear as the blood gets reabsorbed. That's the most reliable timing indication in evaluating trauma. Scars however can mature and heal within usually two weeks but usually within three you would expect them to be completely healed.

Q   So if the stretching or penetration had occurred as recently as four weeks before it could result in the condition that you observed that day?

A   Yes, it could.

Q   So it would take about two to three weeks for that area to heal after stretching or dilation?

A   That's what I would expect.

Q   That's what?

A   That's what I would expect to find, yes.

Q  Did you perform an anal examination on Mindy?
A  Yes.
Q  What did you observe?
A  I saw no evidence of scarring and none of the other findings we specifically looked for such as skin tags, bruising, or any kind of discharge. There was also no evidence of what's called furrowing which is an indentation of the rectal area which often occurs with forceable penetration, so my findings regarding the anus and rectum were normal.
Q  Thank you. Based on the examination that you just described and your observations about Mindy's other physical attributes and her demeanor, were you able to form an opinion as to whether Mindy had been penetrated vaginally or sexually abused?
A  I had a very strong suspicion that she had based on her vaginal examination.
Q  The observations that you made are consistent with penetration of some type?
A  Yes, they are.
Q  Do you have any way of telling what kind of object would have been used to penetrate or cause this condition?
A  I assume it to be an object at least a centimeter in diameter or larger. It's difficult to tell based on the scarring alone the extent to which the penetration or the stretching may have been at the time of penetration. So in other words, it may have scarred down smaller than the actual diameter of the object.
Q  Would it be fair to say that the medical exam would not give you any way of knowing exactly what object may have been used to penetrate a child?
A  That is fair to say.

(Id., pp. 297-302.)

The State also introduced the testimony of Tracy Young, who was employed as Dr. Breitinger's nurse at the time of Mindy's exam. (Id., pp. 306-312.) Ms. Young testified that on the day of the exam, Mindy would giggle upon questioning and acted as if the exam "seemed like a game to her." (Id., p. 309.) She further testified that Mindy told her that Petitioner had touched her "under her clothes" with his fingers and "dingdong." (Id., pp. 311-312.) Ms. Young also stated that during Dr. Breitinger's physical exam, she observed that Mindy's "hymen was gone." (Id., p. 312.)

The State's final witness was William F. Donohoe, II, an employee of the West Virginia Department of Public Safety who investigated the allegations of Petitioner's sexual abuse of Mindy in March, 1994. (Id., pp. 315-316.) Mr. Donohoe testified that he was present during the removal

16

of Mindy and her brothers from their grandmother's home on March 3, 1994. (Id., p. 316.) He stated that Petitioner was present when the children were removed and was advised of the allegations of sexual abuse, which he denied. (Id., pp. 316-317.)

At the close of the prosecution's case in chief, defense counsel moved for the entry of judgment of acquittal. (Id., pp. 323-24.) The trial court found that the inconsistencies in the evidence, as argued by defense counsel, "go to the weight and credibility of the witnesses which are questions for a jury to decide." (Id., pp. 327-28.) Finding that the State's witnesses provided testimony which would support a conviction of the offense with which Petitioner was charged, the trial court denied his motion for acquittal. (Id., p. 328.) Defense counsel further requested that the Court revisit its prior ruling prohibiting evidence of inappropriate sexual activity, which the trial court refused to do. (Id., pp. 328-32.)

Petitioner testified in his own defense. Prior to taking the stand, the trial court advised Petitioner that he had a right not to testify, and that he would subject himself to cross-examination if he did. (Id., pp. 333-34.) He admitted that his sister and her children stayed with him, his mother, and sister in December 1993, and in March, 1994, but denied ever having any sexual contact with Mindy. (Id., pp. 337-38, 341-42.) On cross-examination, Petitioner testified that either the children's mother, grandmother, or aunt cared for them while living with his mother and that he never babysat the children by himself. (Id., pp. 344-45.) He stated that although it was not necessary that someone be with him, another adult was always present when he was with the children. (Id., p. 346.) The only exception was when he took Mark and Jess hunting, but denied ever being alone with Mindy at any time. (Id., pp. 346-48.) He described his relationship with the children as a normal uncle/niece and nephew relationship and could not explain why the children would fabricate the charges against him.

(<u>Id</u>., p. 349.) After the cross-examination of Petitioner, trial counsel moved the trial court again to relax its prior rulings with respect to instances of other abuse. (<u>Id</u>., pp. 355-56.) In support of the motion, trial counsel stated that the State opened the door when the prosecutor asked whether Petitioner had reason to know why the children would accuse Petitioner of such acts if they were not true. (<u>Id</u>., p. 356.) Trial counsel proffered that Petitioner could testify that he observed Mark and Mindy having sexual intercourse, that he told their mother of the incident, and that the children were chastised by their mother for their actions. (<u>Id</u>.) Therefore, the specific act establishes motive for the children to accuse Petitioner. (<u>Id</u>.) In response to the Motion, the State emphasized that during direct examination, Petitioner testified that he knew of no reason why the children would fabricate such a story, which is inconsistent with trial counsel's proffer of a motive. (<u>Id</u>.) The trial court refused to revisit its prior ruling and stated:

> I'm not going to open up the prior ruling with relation to evidence about the other sexual offense acts. I can't see this as any possible justification. The evidence in this case is overwhelming. I believe that it's before the jury now that nobody seemed to be all that - - too much concerned about what was happening to this child and the idea that if he indicated or said something to the mother about these kids doing something and this caused some social upheaval within the family, I just can't buy that.

(<u>Id</u>., p. 357.)

Lenora Persinger, Petitioner's mother and the children's grandmother, also testified on Petitioner's behalf. (<u>Id</u>., pp. 358-400.) On direct examination, Ms. Persinger stated that during the children's stay at her house, the children never complained to her that Petitioner had sexual contact with Mindy. (<u>Id</u>., p. 366.) She further stated that she never heard the children complain of the same to their mother. (<u>Id</u>., p. 367.) On cross-examination, Ms. Persinger testified that excepting times when he took Mark and Jess fishing, Petitioner never took the children anyplace by himself. (<u>Id</u>.,

p. 368.) She further testified that Petitioner did not babysit the children. (Id., p. 369.) Ms. Persinger specifically stated that Petitioner was never alone with the children in any particular room in her house. (Id.) If the children were in Petitioner's room, then Petitioner would be in another room. (Id., p.373.) She did state, however, that Mindy's brothers slept in a set of bunk beds located in Petitioner's room and that Petitioner slept in an adjacent bed. (Id., pp. 373-74.) Ms. Persinger testified that it was her belief that the children fabricated the charges against Petitioner. (Id., p. 381.)

Finally, the defense presented the testimony of Myrtle Marie Ray, the children's mother. (Id., pp. 397-420.) Outside the presence of the jury, Ms. Ray's counsel advised her of her right to remain silent and his admonishment to not testify on her brother's behalf. (Id., pp. 397-99.) Ms. Ray stated that she understood her rights, that she wished to testify on Petitioner's behalf, that she understood the consequences of her statements, and that her decision to testify was of her own free will. (Id.) During her direct examination, Ms. Ray testified that during her stay at her mother's house in December, 1993, her children never reported to her that Petitioner had any sexual contact with them. (Id., p. 404.) She also denied being slapped by Petitioner. (Id., p. 405.) On cross-exam, Ms. Ray denied staying with her mother in December, 1993, due to utility problems. (Id., p. 406.) With respect to Petitioner's contact with the children, Ms. Ray testified that sometimes Petitioner, alone, would drive the children to the bus stop and that he took her three sons fishing by himself. (Id., p. 408.) She further testified that if Mindy went somewhere with Petitioner, she or another adult was present. (Id., p. 409.) Ms. Ray stated that Petitioner would never babysit the children and that he typically ran errands for her mother because she usually did not drive. (Id., pp. 409-10.)

At the conclusion of Ms. Ray's testimony, trial counsel expressed to the trial court his desire to present testimony from witnesses whose testimony was prohibited by prior court rulings, with

respect to prior abuse. (<u>Id</u>., p. 420.) The trial court advised counsel that he could later vouch the record. (<u>Id</u>.)

On May 17, 1995, and July 10, 1995, proceedings were held in the Grand Jury Room of the Jackson County Courthouse, Ripley, West Virginia, for the purpose of vouching the record. (Document No. 18, Exhibits 10-11.) On May 17, trial counsel presented the following witnesses: Mark Ray, Jesse Ray, Amanda Ray, Vincent Ray, Sharon Alonzo, and Margaret Anderson. (<u>Id</u>., Exhibit 10.) The children each recounted their residence history and denied having had sexual contact with anyone, except for Petitioner. (<u>Id</u>.) Specifically, Mark testified that Petitioner visited his family when they were living in Akron, Ohio, and that during his visit, he "played with" him, Jess, and Mindy. (<u>Id</u>., pp. 21-22.) Mark further testified that Petitioner made him perform oral sex on him. (<u>Id</u>., p. 25.) Mark stated that any reports by his neighbors of other incidents of abuse in Charleston, West Virginia, were made up because "they probably hated us . . . [b]ecause we always got in fights down there." (<u>Id</u>., p. 22.) Mindy testified that Petitioner touched her "shina" with his "dingdong." (<u>Id</u>., pp. 49-50.) She could not recall her father, but stated that he was in jail. (<u>Id</u>., p. 51.) Her brother Vince could recall living with his father and knew that he was in jail. (<u>Id</u>., pp. 63-64.) Sharon Alonzo and Margaret Anderson both worked for the Department of Health and Human Resources and testified as to the existence and the whereabouts of the Department's file on the children. (<u>Id</u>., pp. 67-81.)

On July 10, 1995, trial counsel presented the testimony of Angela M. Taylor and Jennifer M. Persinger, the children's aunts, and Lenora M. Persinger, their grandmother. (Document No. 18, Exhibit 11.) Angela Taylor testified that she lived with the children and their parents in Ohio for a certain period of time, with her daughter. (<u>Id</u>.) While living with them, she stated that she observed

their mother fondling the children's "private parts" while bathing them (Id., pp. 15-16.), Mark performing oral sex on Mindy (Id., p. 21.), Mark fondling Mindy's vagina (Id., p. 24.), Bill placing his hand under Mindy's skirt and then giving the appearance that he was sexually abusing her (Id., p. 26.), and Bill and Myrtle having sexual intercourse in front of Mark and Jess, with their knowledge. (Id., pp. 27-29.)  Ms. Taylor stated that Bill asked the boys: "Do you guys think you guys would ever be man enough to do something like this?" (Id., p. 29.) Early on, Ms. Taylor advised the children's parents of what she observed, but their parents were defensive and told her to mind her own business. (Id., pp. 20-21, 24-25.) On one occasion, Bill, the children's father, threatened to kill her if she said anything about what she saw. (Id., p. 21.) Ms. Taylor eventually stopped reporting to the parents what she observed. (Id., pp. 35-36, 39-40.)

After the children and their mother moved to West Virginia, Ms. Taylor again observed Mark fondling Mindy (Id., pp. 34-35.), and having sexual intercourse with her. (Id., pp. 38-39.) Although she did not tell the children's mother that she saw them having sex, she eventually told her husband and mother. (Id., p. 57.) In December, 1993, Ms. Taylor testified that she, Henry, and Jennifer saw Mark and Mindy having sexual intercourse at their grandmother's house. (Id., pp. 64-65.) She stated that the children were on the bed in Jennifer's room and were uncovered. (Id., pp. 64-65.) Ms. Taylor, however, testified that to her knowledge, Petitioner was never left alone with the children and would never sexually abuse them. (Id., pp. 74-78.) She admitted that when she was not there, she had no way of knowing what went on in the house. (Id., p. 74.)

Jennifer Persinger testified to having observed the children having sexual intercourse, but stated that the children had a sheet over them. (Id., pp. 88-90, 101.) Jennifer stated that she assumed the children knew she reported to their mother what she saw, but that they acted as if it did not

bother them; "[t]hey acted just like normal." (<u>Id.</u>, p. 103.) She further testified that Vince refused to sleep with his mother because the night before she had undressed him, fondled him, and forced him to fondle her. (<u>Id.</u>, pp. 92-93.) She stated that the children were never alone in Petitioner's room with him (<u>Id.</u>, pp. 97-98.) and that he never babysat the children primarily because of their unruly behavior. (<u>Id.</u>, p. 107.)

Finally, Lenora Persinger testified that she observed Mark playing with Vince's "wee wee." in a sexually suggestive manner. (<u>Id.</u>, p. 120.) She reported the incident to their mother and Henry advised Mark that his behavior was inappropriate. (<u>Id.</u>, pp. 121-22.) She further testified that Vince told her that his mother fondled him and made him fondle her. (<u>Id.</u>, pp. 124-26.) After this incident, Lenora said that Vince always slept in Petitioner's room. (<u>Id.</u>, pp. 127-28.) Ms. Persinger insisted that Petitioner did not sexually abuse the children. (<u>Id.</u>, pp. 152-174.)

## <u>ANALYSIS</u>

**1.    Petitioner is not entitled to a new trial based upon "newly discovered" evidence with respect to the State's expert witness, Dr. Breitinger.**

In ground one of his Petition, Petitioner alleges that the trial court erred "by disregarding newly discovered evidence relating to the qualification of Dr. Breitinger." (Document No. 1, p. 9.) He further argues that because Dr. Breitinger's trial testimony "constituted the only objective evidence of penetration, an essential element of both first degree sexual assault and incest, offered by the State", the disciplinary proceedings against him and the investigations of him cast doubt on "not only his qualifications, but also on his competency and mental status." as an expert witness. (Document No. 1, pp. 9-10.) Petitioner therefore contends that this "newly-discovered evidence of deceit and bizarre behavior by the State's expert clearly would have had an enormous impact on the questions of his credibility and competency upon the trial Court decision to qualify him as an expert

22

witness. Consequently, the Petitioner is entitled to a new trial." (Id., p. 15.)

The substance of Petitioner's alleged newly discovered evidence is as follows. Dr. Breitinger's license to practice medicine and surgery was suspended on May 2, 1996, by the West Virginia Board of Medicine [the Board], for his failure to submit to a complete physical and mental examination as scheduled by the Board. (Id. Document No. 8, Exhibit 8.) Proceedings against Dr. Breitinger were commenced by the Board in the summer of 1994, when the Board received information indicating that Dr. Breitinger's application for medical licensure in New Jersey had been withdrawn in May, 1994, prior to the New Jersey Board of Examiner's resolution of "possible adverse issues." (Document No. 8, Exhibit 8, "Recommended Findings of Fact and Conclusions of Law of Hearing Examiner, ¶ 3.) On August 23, 1994, the Board's Executive Director, Ronald D. Walton, requested from the New Jersey Board [NJ Board], information pertaining to the disciplinary action therein against Dr. Breitinger. (Document No. 8, Exhibit 8, Letter.) The NJ Board sent Mr. Walton a copy of their Administrative Action Order entered May 13, 1994, indicating that proceedings were initiated by the NJ Board when they asked Dr. Breitinger to explain a three and one half year gap in his curriculum vitae. (Document No. 8, Exhibit 8, New Jersey Board Order.) Dr. Breitinger explained that after his service as a medical officer in the United States Army, he stayed in Germany for several months and then vacationed in Canada. (Id.) The New Jersey Board requested that he submit written corroboration pertaining to his stay in Canada. (Id.) In response, Dr. Breitinger submitted voluminous documents purporting to amend his previous statement and further explaining that during the period of time in question, he had to pursue

> legal proceedings against military and civil officers of the Untied States . . . in response to documented incidents of medical negligence, public endangerment, corruption, conspiracy and cover-up, the submission of lies to Congress, and contempt and subversion of the Constitution of the United States to include Treason

23

against the United States by innumerable military and 'civil' officers of the United States, and which included the Governor of the State of New Jersey, James Florio . . .

(Id., p. 2.)

The NJ Board considered Dr. Breitinger's responses and requested that he undergo a mental evaluation. (Id.) After meeting with a psychiatrist in May, 1993, at his own expense, Dr. Breitinger insisted that the clinical interview never took place and submitted the invoice for the evaluation to the NJ Board for payment. (Id., p. 3.) Dr. Breitinger accused the NJ Board of violating the Constitution and alleged that "he did not 'pay the Board to cast political judgment born of their own psychological defense mechanism in the face of documented facts pertaining to issues of medical ethics and abuse of authority independent of my personal practice of medicine." (Id., p. 4.)(emphasis in original). Dr. Breitinger refused to submit the report of his psychiatric evaluation to the New Jersey Board and requested that his Application be withdrawn. (Document No. 8, Exhibit 8, Board's Recommended Findings of Fact and Conclusions of Law of Hearing Examiner, pp. 6-7, ¶ 10.) Based on his refusal and "the tenor of [his] correspondence," the NJ Board "harbor[ed] concern about his capacity to practice medicine and surgery," and allowed him to withdraw his licensure application. (Id.)

By letter dated September 27, 1994, Mr. Walton advised Dr. Breitinger that based upon the New Jersey documentation, it appeared that he tendered false statements in his West Virginia application submitted on June 20, 1993, and therefore, he was giving him an opportunity to surrender his license to practice medicine and surgery in West Virginia, prior to submitting all information to the Board for review. (Document No. 8, Exhibit 8, Sept. 27, 1994 Letter.) In his response dated October 1, 1994, Dr. Breitinger alleged that Mr. Walton's assertions were

24

"unfounded, false, [and] bordering on libel." (Document No. 8, Exhibit 8, Findings and Conclusions, p. 7, ¶ 12.) Accordingly, on November 14, 1994, the Board's Complaint Committee filed a Complaint against Dr. Breitinger charging him with "obtaining or renewing a medical license and presenting false statements in connection with an application for a medical license." (Document No. 8, Exhibit 8, Nov. 21, 1994 Letter.) Dr. Breitinger appeared before the Complaint Committee in January, 1995, after which an investigation was conducted. (Document No. 8, Exhibit 8, Findings and Conclusions, p. 8, ¶ 15.) The investigation revealed that Dr. Breitinger was under investigation by the Secret Service because of threatening posters and letters he sent to the President of the United States, the Vice-President, the Attorney General, and other governmental officials. (Id., ¶¶ 16-17.) The Secret Service concluded that although he presented no danger, he was "highly critical and intolerant of officers who did not share his perspective to an officer from the military." (Id., ¶ 17.)

In June, 1995, Mr. Walton, on behalf of the Board's Complaint Committee, requested that Dr. Breitinger undergo a complete physical and mental examination. (Id., ¶ 18.) Dr. Breitinger however, refused to undergo the examination and testified that he understood the consequences of not proceeding with the examination. (Id., ¶¶ 20-21.) A second Complaint was issued against Dr. Breitinger for his failure to attend the scheduled examination. (Id., ¶ 24.) In response to the second Complaint, Dr. Breitinger submitted to the Board a letter dated August 26, 1995, alleging that he possessed documented "corruption" on the part of Mr. Walton and that Mr. Walton has "embarked on a nearly year-long personal vendetta" against him. (Id., ¶ 27.) Dr. Breitinger further sent letters to the "Ravenswood Community," addressing the alleged corruption and stating that Mr. Walton was "perpetrating a vindictive hate-campaign against [him] for apparently racist reasons." (Id., ¶¶ 26-27.) He also sent similar letters to the Governor of West Virginia and to his patients. (Id., ¶¶ 28-32.)

Testimony at the Board's hearing on October 26, 1995, revealed "no evidence of racism on the part of Mr. Walton as perceived by Respondent." and that Mr. Walton acted appropriately in accordance with standard procedures. (<u>Id</u>., ¶¶ 33-35.) The Board's Hearing Examiner concluded that Dr. Breitinger's failure to submit to a complete physical and mental examination violated West Virginia Code § 30-3-14(c)(20) relating to professional incompetence. (<u>Id</u>., p. 18.) The Examiner further concluded that his signing and dissemination of letters to the community of Ravenswood and to the Governor containing unfounded allegations against Mr. Walton violated West Virginia Code § 30-3-14(c)(17) and 11 C.S.R. § 1A 12.1(e) and (j), relating to unprofessional, unethical, and dishonorable conduct. (<u>Id</u>., pp. 18-19.) The Examiner recommended that the Board suspend Dr. Breitinger's medical license until he submitted to a complete physical and mental examination. (<u>Id</u>., p. 20.)

By Order entered January 25, 1996, the Board adopted the Examiner's findings and ordered that Dr. Breitinger's license be suspended and that he submit to a complete physical and mental examination on or before May 1, 1996. (Document No. 8, Exhibit 8, Jan. 25, 1996 Order.) Dr. Breitinger failed to submit to the examination and therefore, by Notice entered May 2, 1996, the Board suspended his license. (<u>Id</u>., May 2, 1996, Notice.)

In his Motion for Summary Judgment, Respondent contends that this issue is a matter of State law that is not cognizable in federal *habeas* review and therefore should be dismissed. (Document No. 16, pp. 8-9.) Respondent acknowledges, however, that State Court rulings are cognizable in federal *habeas* review to the extent that they render the entire trial fundamentally unfair. (<u>Id</u>.) Alternatively, Petitioner contends that Petitioner's claim is without merit; he neither demonstrates that Dr. Breitinger's testimony rendered his trial fundamentally unfair, nor establishes that "had the 'newly discovered evidence' been available at trial, the trial would have resulted in an

26

acquittal or that a re-trial incorporating the 'newly discovered evidence' would [have] resulted in an acquittal." (Id., pp. 9-10.)

Applying a five-factor test to determine whether a new trial was warranted, the State *habeas* Court concluded that Petitioner was not entitled to a new trial under West Virginia law, as follows:

> The amended petition shows that evidence concerning disciplinary action taken by the New Jersey and West Virginia boards of medicine was discovered after trial. Further, the court is sure that the evidence, in a practical sense, could not have been reasonably discovered. As to the requirement that new evidence not be cumulative, the court finds that the expert's opinion regarding the results of the medical examination of the child was not cumulative; however testimony by the doctor relating Mindy's statements was cumulative. In addition to the doctor's testimony, three persons testified about statements made by the child regarding sexual abuse and incest committed by the petitioner or actually observed the sexual abuse. They are the doctor's nurse, and Mindy's brothers, Mark and Vincent.
>
> The court also finds the evidence fails to meet the last two elements of the relevant test. A review of the record leaves the Court with a firm belief that the results of a second trial, with or without the testimony of Dr. Breitinger, would be the same. At the time of trial, Dr. Breitinger was a licensed medical doctor, and he was clearly qualified to testify as an expert medical witness. Even if the newly discovered evidence impeached Dr. Breitinger, the court fails to see how the result would be different, especially since the doctor was not the sole witness for the government upon whose testimony the petitioner's conviction rests. Since the court finds three of the necessary elements have not been proven by a preponderance of the evidence, this ground for habeas corpus relief fails as a matter of law.

(Document No. 8, Exhibit 7, pp. 5-6.)

"[F]ederal habeas corpus relief does not lie for errors of state law[; . . . and] it is not the province of a federal habeas court to reexamine state-court determinations on state law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991). Accordingly, to the extent that Petitioner asserts that the alleged State Court error resulted in undue prejudice, or that his trial was fundamentally unfair as a result of these actions, the undersigned will consider the claim to have alleged a violation of

Petitioner's due process rights.

The grounds for federal *habeas* relief based on newly discovered evidence are "exceedingly narrow." Stockton v. Virginia, 852 F.2d 740, 749 (4th Cir. 1988), cert. denied, 489 U.S. 1071, 109 S.Ct. 1354, 103 L.Ed.2d 822 (1989). The newly discovered evidence "must bear upon the constitutionality of the applicant's detention; the existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus." Townsend v. Sain, 372 U.S. at 317, 83 S.Ct. at 759; see also, Herrera v. Collins, 506 U.S. 390, 400, 113 S.Ct. 853, 860, 122 L.Ed.2d 203 (1993) (stating that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceedings."). "This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution - - not to correct errors of fact." Herrera, 506 U.S. at 400, 113 S.Ct. at 860.

In view of these stringent standards, the undersigned agrees with Respondent and finds that Petitioner's newly discovered evidence constitutes a challenge to the merits of his conviction and not to its legality. See e.g., Smith v. Wainwright, 741 F.2d 1248, 1257 (11th Cir. 1984), cert. denied, 470 U.S. 1087, 105 S.Ct. 1853, 85 L.Ed.2d 150 (1985)("Newly discovered evidence in the form of a confession by another does not 'render the conviction void and subject to collateral attack by habeas corpus because it goes to the merits of the conviction, not its legality.")(citations omitted). To establish a due process violation, Petitioner must demonstrate that the State prosecuting attorney knew that Dr. Breitinger's testimony was false or inaccurate. See Stockton, 852 F.2d at 749 ("When public officers connive at or knowingly acquiesce in the use of perjured evidence, their misconduct

denies a defendant due process of law. Recantation of testimony alone, however, is insufficient to set aside a conviction on the ground that the due process clause has been violated. A habeas corpus petitioner must show that the prosecutor or other government officers knew the testimony in question was false in order to prevail."). Petitioner neither alleges that Dr. Breitinger testified falsely, nor that the State knew that his testimony was false or inaccurate.

Furthermore, Petitioner has not alleged that the newly discovered evidence would have changed the outcome of his trial or that Dr. Breitinger's testimony was prejudicial to him. Substantively, Dr. Breitinger's testimony revealed that Mindy's hymen was missing and that he observed well-developed scar tissue, which indicated Mindy had not been traumatized within the three weeks preceding his exam. He further expressed his expert opinion that based upon his examination, Mindy had been penetrated vaginally. Dr. Breitinger did not, and could not, testify that Petitioner was the individual who abused Mindy. Notwithstanding his professional opinion, the sum and substance of his testimony was cumulative of Keitha Graham's testimony, who testified that Mindy had been "penetrated vaginally and sexually abused" by someone other than Petitioner and that based on Mindy's statements to her, the Petitioner penetrated her with his fingers and penis. Moreover, the State produced the testimony of Tracy Young who also testified as to Mindy's statements and to her observation of Mindy's missing hymeneal ring. In view of the foregoing, the undersigned finds that Petitioner has neither demonstrated that Dr. Breitinger's trial testimony was false and that the State knew the testimony was false, nor that the introduction of the newly discovered evidence would have significantly altered the outcome of his trial; Petitioner's conviction was not had on Dr. Breitinger's testimony alone. The newly discovered evidence does little more than impeach the credibility of the State's medical expert witness. Accordingly, the undersigned

29

finds that Petitioner is not entitled to *habeas* relief and recommends that Respondent's Motion be granted with respect to Petitioner's first ground for relief.

2.    **Petitioner was not denied his constitutional right to a fair trial by the trial court's failure to allow him to introduce evidence of specific acts of prior sexual abuse by others.**

Petitioner alleges that the trial court denied him the right to a fair trial under the Fourteenth Amendment when he was prohibited from introducing evidence of prior sexual abuse inflicted on the victim by others. (Document No. 1, pp. 15-19.) In support of this ground for relief, Petitioner states:

> Here, the defense was not attempting to show that Mindy was sexually promiscuous or to smear her. As is noted throughout this petition, the State's case consisted almost entirely of inconsistent statements by the children and hearsay testimony by the adults. Consequently, credibility was a critical issue at trial. One of the defense contention's was that the children had been repeatedly and consistently sexually abused by their parents and had engaged in inappropriate sexual activity with each other. This raised a legitimate issue as to whether the children had a motive to make false accusations against [the] Petitioner. With credibility such a key issue, evidence that the children had engaged in similar inappropriate behavior before visiting in the petitioner's home was essential to establish not only that the children had a motive for fabricating their allegations, but also to show how the children had learned such behavior.

(Document No. 1, p. 18.)

Respondent contends that this issue is a matter of State evidentiary law that is not cognizable in federal *habeas* review. (Document No. 16, pp. 7-8, 11-14.) Again acknowledging that State Court rulings are cognizable in federal *habeas* review to the extent that they render the entire trial fundamentally unfair however, Respondent contends that "any limitation on evidence of the victim's prior sexual abuse prior to the rape shield statute did not call into question the fairness of the trial in this matter." (Id., p. 14.) Respondent states:

> The jury was offered testimony from which it could have surmised that the

Petitioner's family is one where the sexual abuse of children is not the abomination it is in society at large but is cultural and generational. Therefore, any history of prior sexual abuse of the victim would be consistent with the evidence given at trial. Moreover, the prior sexual abuse of the victim had no bearing on the Petitioner's guilt nor did it cast doubt on his guilt.

The victim testified, as did two witnesses, to the abuse. The State stipulated to the past sexual abuse of the victim.

(Id.)

The State *habeas* Court concluded that the trial court properly excluded the evidence under the "rape shield" statute, W.Va. Code §61-8B-11. (Document No. 8, Exhibit 7, pp. 6-7.) The Court found that the evidence "lacked probative value in determining the guilt or innocen[ce] of the petitioner." and that any prejudice suffered by Petitioner by its exclusion was "neutralized by the introduction of the stipulation advising the jury that the victim had been sexually abused by someone other than the defendant prior to Christmas, 1993, the period of time that the State charged that the petitioner committed the instant offenses." (Id., p. 7.)

Federal *habeas* relief lies to determine "whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle, 502 U.S. at 67-68, 112 S.Ct. at 480. Therefore, violations of state law and procedure that do not implicate specific federal constitutional provisions are not cognizable in *habeas* review. Id.; see also, Fisher v. Angelone, 163 F.3d 835, 854 (4th Cir. 1998). Generally, federal *habeas* relief is available with respect to a trial court's evidentiary rulings, only if the ruling denied the defendant the right to a fair trial. See Abrams v. Barnett, 121 F.3d 1036, 1042 (7th Cir. 1997). When the challenged evidentiary rulings "so infected the entire trial that the resulting conviction violates due process," it is presumed that the defendant was denied a fair trial. Cupp v. Naughten, 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). The fact that the evidence allegedly was improperly excluded under state law however, does not provide a basis for

*habeas* relief. "[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules." Marshall v. Lonberger, 459 U.S. 422, 438, n. 6, 103 S.Ct. 843, 853, n. 6, 74 L.Ed.2d 646 (1983). The proper inquiry for the Court is whether the exclusion of the evidence itself so infected the entire trial that the resulting conviction violates due process. See Estelle, 502 U.S. at 72, 112 S.Ct. at 482. To determine this, the Court "must determine whether the rule relied upon for the exclusion of evidence is 'arbitrary or disproportionate' to the 'State's legitimate interests.'" Quinn v. Haynes, 234 F.3d 837, 849 (4th Cir. 2000), cert. denied, 532 U.S. 1024, 121 S.Ct. 1968, 149 L.Ed.2d 762 (2001)(*citing* Michigan v. Lucas, 500 U.S. 145, 151, 111 S.Ct. 1743, 114 L.Ed.2d 205 (1991); Rock v. Arkansas, 483 U.S. 44, 55, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987).). See also, Johnson v. Bett, 349 F.3d 1030, 1035 (7th Cir. 2003)(stating that "[t]he states have broad latitude to establish rules excluding evidence so long as the rules are not arbitrary or disproportionate to the purpose they are designed to serve. The exclusion of evidence is unconstitutionally arbitrary or disproportionate only in circumstances in which it has infringed on a weighty interest of the accused.").

Petitioner sought to introduce evidence of prior sexual abuse inflicted on Mindy through cross-examination of Mindy and Dr. Breitinger and through direct examination of unnamed defense witnesses. (Document No. 17, Exhibit 9, pp. 48-82, 251-52, 328-33, 420.) The evidence was offered "for impeachment purposes," as "rebuttal of the medical evidence," and "as substantive evidence to offer another theory." (Id., pp. 70, 74.) After hearing arguments from counsel, the trial court ruled that the evidence of prior specific acts was not relevant to the decision as to whether Petitioner committed the alleged acts in question and excluded the same under the West Virginia Rape Shield Statute, W.Va. Code § 61-8B-11(b). (Id., pp. 73-74.) The trial court acknowledged however, the

importance for the jury to know that Mindy's hymeneal ring could have been broken as a result of the prior abuse and not solely because of Petitioner's conduct. (Id.) The State therefore agreed to stipulate that Mindy had been sexually abused by someone other than Petitioner and that such abuse encompassed penetration of her vagina. (Id., p. 75.) Finally, the trial court concluded that Petitioner had not laid the proper foundation for admitting the evidence to demonstrate that Mindy had a motive to fabricate the charges against Petitioner. (Id., pp. 73-74.)

The West Virginia Rape Shield Statute prohibits inquiry into the victim's prior sexual conduct with persons other than the defendant. W. Va. Code § 61-8B-11(b).[7] The statute, in itself, is neither arbitrary, nor disproportionate to its purpose; the statute is intended "to protect victims of sexual abuse from protracted attacks on their character through evidence of prior sexual activity." Quinn, 234 F.2d at 848; see also, State v. Guthrie, 205 W.Va. 326, 339, 518 S.Ed.2d 83, 96 (1999). (The SCAWV articulated that the purpose of the Rape Shield Statute is "to protect the victims of sexual assault from humiliating and embarrassing public fishing expeditions into their sexual conduct, to overcome victims' reluctance to report incidents of sexual assault, and to protect victims from psychological or emotional abuse in court as the price of their cooperation in prosecuting sex offenders."). The relevant determination is whether the trial court's use of the rape shield law to

---

[7] Section 61-8B-11(b) states:

In any prosecution under this article evidence of specific instances of the victim's sexual conduct with persons other than the defendant, opinion evidence of the victim's sexual conduct and reputation evidence of the victim's sexual conduct shall not be admissible: Provided, that such evidence shall be admissible solely for the purpose of impeaching credibility, if the victim first makes his or her previous sexual conduct an issue in the trial by introducing evidence with respect thereto.

W.Va. Code § 61-8B-11(b).

limit Petitioner's proffered cross-examination of Mindy and Dr. Breitinger was an unreasonable application of Supreme Court precedent. The Sixth Amendment's Confrontation Clause guarantees a criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. This right is secured to State Court defendants through the Fourteenth Amendment. See Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). The Supreme Court emphasized in Davis v. Alaska, 415 U.S. 308, 315, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974) that the essential purpose of the Confrontation Clause "is to secure for the opponent the opportunity of cross-examination." The Confrontation Clause however, guarantees only "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Delaware v. Fensterer, 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985); see also, Brecht v. Abramson, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).

> It does not follow, however, that the Confrontation Clause of the Sixth Amendment prevents a trial court from imposing any limits on the scope of defense counsel's cross-examination and presentation of evidence related to the impeachment of a key prosecution witness's credibility. "On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. VanArsdall*, 475 U.S. 673, 678, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).

Quinn v. Haynes, 234 F.3d at 847.

Under this analytical framework, the undersigned finds that the trial court's application of the rape shield statute to exclude evidence of prior specific acts of sexual abuse was neither arbitrary, nor disproportionate to the statute's purpose. Although such evidence is generally admissible to show a source of sexual knowledge and an alternate explanation to injuries of a sexual

nature, the agreed upon stipulation that the victim was sexually abused by someone in addition to Petitioner, eliminated the necessity for admission of the evidence for these purposes. See e.g., United States v. Begay, 937 F.2d 515, 519-23 (10th Cir. 1991); United States v. Bear Stops, 997 F.2d 451, 457 (8th Cir. 1993)(en banc); Tague v. Richards, 3 F.3d 1133, 1139 (7th Cir. 1993). With respect to impeachment, the trial court withheld final judgment until the opportunity presented itself, which the trial transcript reveals, it did not. The trial court's exclusion of the evidence for these two stated purposes therefore, was neither arbitrary, nor disproportionate to the State's interests of protecting the victim. The remaining issue, therefore, is whether Petitioner was unconstitutionally denied the opportunity to present the evidence of prior specific acts to demonstrate that Mindy had a motive to fabricate the charges against him. Petitioner does not define his "theory" or defense of the case with respect to the proffered fabrication. In his § 2254 Petition, however, it appears that Petitioner is arguing that the evidence would have revealed that the children were "repeatedly and consistently sexually abused by their parents and had engaged in inappropriate sexual activity with each other" and therefore, they *may* have "had a motive to make false accusations against" Petitioner. (Document No. 1, p. 18.) This defense is replete of speculation. The only logical inference that can be from this allegation is that the children fabricated the charges against Petitioner to prevent their mother from being taken away from them as had their father. Nothing in the transcripts from the pretrial hearings, the trial, or the hearings vouching the record after the trial, support such an allegation.

During the vouching hearings, Mindy and her three brothers each testified to the abuse inflicted by Petitioner but failed to speak of any abuse by their parents or each other. (Document No. 16, Exhibit 10.) Furthermore, although the children acknowledged that their father was in jail, they

35

did not make any statements insinuating that they feared at any time that their mother would go to jail, too. (Id., pp. 63-65.) The children's aunts, Angela Taylor and Jennifer Persinger, and their grandmother, Lenora Persinger, all testified that they had observed the children engaged in sexual conduct with each other. (Document No. 16, Exhibit 11.) Additionally, Angela Taylor testified that she thought Mindy's father was abusing her and that her mother engaged in inappropriate sexual conduct with the children. (Id.) Specifically, Ms. Taylor said that she observed the children's mother fondling the four children in the bathtub (Id., pp. 15-18.); Mindy's father placing his hand under her skirt (Id., p. 26.); Mark and Mindy in compromising situations on a daily basis (Id., pp. 26-27.); and Mark and Jess in the living room watching their parents have sexual intercourse, with their knowledge. (Id., pp. 29-30.) Jennifer Persinger testified that she and Petitioner observed Mark and Mindy having sexual intercourse (Id., pp. 88-89); and that Vince told her that his mother had undressed him, touched him between his legs, and made him touch her between her legs and on her breasts. (Id., pp. 92-93.) Finally, Lenora Persinger testified that she observed Mark fondling Vince (Id., p. 120.) and that Vince told her his mother touched him and made him touch her. (Id., pp. 124-25.) The testimony reveals nothing to support Petitioner's claim that the children had a motive to fabricate the charges against Petitioner. Although Ms. Taylor testified to one incident on which Mark lied to his father about possessing a lighter (Exhibit 10, pp. 66-67.), the testimony otherwise does not reveal a propensity on behalf of the children to lie. In fact, the evidence suggests only that the children were abused by each other and possibly by their parents, but it does not exculpate Petitioner of abusing Mindy. Ms. Taylor admitted that she had no way of knowing what occurred in Petitioner's mother's house when she was not there. (Exhibit 11, pp. 74-75.)Without establishing a proper foundation for Petitioner's theory that the children were motivated to fabricate the charges

against him, the evidence was properly excluded under the rape shield law and the trial court's

ruling precluding its introduction was neither arbitrary, nor disproportionate to the State's interests.

The Respondent therefore, is entitled to summary judgment on Petitioner's second ground for relief.

### 3.    The State did not commit a <u>Brady</u> violation.

In his final ground for *habeas* relief, Petitioner alleges that the State withheld until six days

prior to trial, certain Department of Health and Human Resources [DHHR] records pertaining to

inappropriate sexual activity by Mindy and her brothers during the time frame of the crimes charged

against Petitioner. (Document No. 1, pp. 19-21.) Petitioner contends that the delay in disclosure

"prevented the defense from learning about critical evidence, namely the fact that the children had

been reported as having engaged in inappropriate sexual behavior before moving to Jackson

County." (Document No. 1, pp. 20-21.) He further alleges that the trial court's denial of his motions

for a continuance and to compel the State to disclose the names which were redacted in the DHHR

records "prevented defense counsel from interviewing those witnesses and severely restricted his

ability to investigate and prepare for trial." (<u>Id</u>., p. 21.)

In his Motion for Summary Judgment, Respondent argues that Petitioner fails to establish

a <u>Brady</u> violation. (Document No. 16, pp. 15-18.) First, Respondent asserts that the State did not

suppress the DHHR records in question. (<u>Id</u>., p. 15.) Second, Respondent contends that Petitioner

"has not demonstrated that the evidence was material to his guilt or innocence nor that it was

'favorable' to [h]is defense." (<u>Id</u>.) Any evidence of improper sexual activity of the children would

have been consistent with Keitha Graham's testimony as to the behavior of abused and neglected

children in general. (<u>Id</u>., p. 16.) Furthermore, Respondent argues that Petitioner has not established

that the delay in disclosing the evidence prejudiced him or that earlier disclosure would have

changed the outcome of his trial. (Id., pp. 15-16.) Finally, Respondent contends that with respect to his motion to continue, Petitioner has not established that he was prejudiced by the trial court's failure to grant his motion. (Id., pp. 16-17.) Respondent avers that "[f]or the defense to call witnesses who claimed to have witnessed the children involved in inappropriate sexual conduct among themselves may even have bolstered the prosecution as behavior consistent with profound neglect and sexual abuse." (Id., p. 17.) Petitioner's claim therefore, must be dismissed.

> In reviewing this ground for relief, the Circuit Court of Jackson County held:
>
> The court finds no due process violation since the DHHR records were disclosed by the State prior to trial. Further, the court finds that the petitioner was not materially prejudiced by the denial of his motion for a continuance. The petitioner also claims that disclosure of the names of persons reporting the inappropriate sexual behavior of Mindy and her siblings should have been disclosed to the petitioner. The court disagrees since the relevant, material information was disclosed before trial, the court properly respected the anonymity of persons reporting the behavior.

(Document No. 8, Exhibit 7.)

It is well established that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963). In United States v. Agurs, 427 U.S. 97, 111, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1976), the Supreme Court clarified the prosecutor's duty to require disclosure of favorable evidence to the defense, even if not requested. This duty encompasses impeachment evidence, exculpatory evidence, and evidence "known only to police investigators and not to the prosecutor." Kyles v. Whitley, 514 U.S. 419, 438, 115 S.Ct. 1555, 1567-68, 131 L.Ed.2d 490 (1995). However, a prosecutor does not have a "constitutional duty routinely to deliver his entire file to defense counsel." United States v. Agurs, 427 U.S. at 111, 96 S.Ct. at

38

2401. If the prosecution suppresses <u>Brady</u> material, the disclosure of which would have in all reasonable probability resulted in a different outcome, then the mandates of due process are violated. See <u>United States v. Bagley</u>, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); <u>Brady v. Maryland</u>, 373 U.S. at 87, 83 S.Ct. at 1196-97. To state a valid <u>Brady</u> claim therefore, the evidence "must be favorable to the accused, either because it is exculpatory, or because it is impeaching, [the] evidence must have been suppressed by the State, either willfully or inadvertently," and the evidence must have been material to the verdict such that its suppression prejudiced the defense. <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999); <u>Monroe v. Angelone</u>, 323 F.3d 286, 299-300 (4th Cir. 2003). However, "when the claim is one of delayed disclosure rather than complete suppression . . . [the Court] need not reach the question whether the evidence at issue was 'material' under <u>Brady</u> unless the defendant first can show that defense counsel was 'prevented by the delay from using the disclosed material effectively in preparing and presenting the defendant's case.'" <u>United States v. Lemmerer</u>, 277 F.3d 579, 588 (1st Cir.), cert. denied, 537 U.S. 901, 123 S.Ct. 217, 154 L.Ed.2d 173 (2002)(*quoting* <u>United States v. Ingraldi</u>, 793 F.2d 408, 411-12 (1st Cir. 1986)).

> The "principal concern" in such cases is "whether the failure to supply the information in a seasonable fashion caused the defense to change its trial strategy." *United States v. Joselyn*, 99 F.3d 1182, 1196 (1st Cir. 1996). Thus, the defendant must show that "learning the information altered the subsequent defense strategy and [that], given timeous disclosure, a more effective strategy would likely have resulted." *United States v. Devin*, 918 F.2d 290 (1st Cir. 1990). He cannot rely on wholly conclusory assertions but must bear the burden of producing, at the very least, a prima facie showing of a plausible strategic option which the delay foreclosed." *Id.*

<u>Lemmerer</u>, 277 F.3d at 588.

Petitioner first alleges that the prosecutor's delay in disclosing the DHHR records prevented

him from learning that the children had engaged in inappropriate sexual activity prior to moving to Jackson County, West Virginia. Analyzing this claim under <u>Brady</u>, the undersigned finds that the State inadvertently delayed disclosing until November 22, 1994, six days prior to trial, these particular DHHR records. The assistant prosecuting attorney explained to the trial court that during the summer of 1994, DHHR provided her office with part of its departmental file containing various records and reports of referents detailing additional instances of sexual activity between Mindy and other individuals. The file was in the State's possession for approximately two or three weeks, during which time Ms. Taylor was unaware of the documents' existence. Ms. Taylor admitted "it was sitting on my desk and I had no idea that the information was in it that Mr. Benford has since found in it. I never looked in it. It was in my possession but I never had a chance to look in it." (Document No. 17, Exhibit 9, pp. 137-38.) She further stated that none of the DHHR employees advised her of the documents although they were obviously aware of their existence. (<u>Id</u>., p. 138.) Accordingly, Petitioner has satisfied this prong of the <u>Brady</u> analysis.

The undersigned further finds however, that Petitioner has failed to demonstrate that the evidence contained in the DHHR records was either favorable to him or that the delay in disclosure impeded his ability to prepare and present his defense. The records and reports pertain to instances of sexual activity between Mindy and other individuals. In no manner do these documents purport to exculpate Petitioner of any wrongdoing. Furthermore, the delay in disclosure did not hinder Petitioner's ability to defend the criminal charges. Reading this claim in conjunction with his second ground for relief addressed above, it appears that defense counsel intended to establish that the victim and her brothers had a motive to fabricate the charges against Petitioner, presumably to protect the children's parents from facing criminal charges of sexual abuse. In the instant Petition,

40

Petitioner states that from 1982 through 1990, Mindy and her brothers lived with their parents in Ohio, where the parents were observed sexually abusing the children.[8] (Document No. 1, p. 17.) In 1990, warrants were issued in Ohio for the parents' arrest pursuant to an incident where their infant sibling was severely burned. (Id.) Upon hearing of the warrant, Mindy's father moved the children and their mother to West Virginia and he later returned to Ohio where he was arrested and convicted of child endangerment. (Id.) Notwithstanding the State's inadvertent nondisclosure, Ms. Taylor advised the trial court that defense counsel was made aware of at least a couple of occasions on which the children were sexually active with each other early on in the criminal proceedings. Reading this claim together with Petitioner's second ground for relief, it appears that Petitioner cannot demonstrate that the delay in disclosure of this evidence prevented him from effectively preparing and presenting his case. As already discussed, the evidence of specific prior acts of sexual abuse was excluded by the trial court, and Petitioner has not established a plausible defense which was foreclosed by the delayed disclosure.

Petitioner next alleges that he was denied due process by the prosecutor's failure to disclose the names of witnesses to the alleged abuse on the children by others in addition to Petitioner. Because the trial court excluded such evidence from the jury, the undersigned finds that the specific names of the witnesses had no bearing on the outcome of Petitioner's criminal proceedings. Moreover, the testimony offered in the hearings vouching the record after trial, with respect to the evidence of other abuse, does not in any manner suggest that a different outcome would have resulted with the inclusion of such evidence.

---

[8] Although not stated, the Court presumes that this information was contained within the DHHR records which were not disclosed until six days prior to trial.

Finally, Petitioner alleges that he was denied due process when the trial court refused to grant a continuance in view of the delay in disclosure of the DHHR documents. The request for a continuance is a matter within the sound discretion of the trial Court. See Ungar v. Sarafite, 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L.Ed.2d 921, 931 (1964); Avery v. State of Alabama, 308 U.S. 444, 446, 60 S.Ct. 321, 322, 84 L.Ed. 377 (1940); see also, United States v. Schembari, 484 F.2d 931, 934 (4th Cir. 1973). The Due Process Clause of the Fourteenth Amendment is implicated only when the trial Court's denial of a motion for continuance is arbitrary and fundamentally unfair. See Ungar v. Sarafite, 376 U.S. at 589, 84 S.Ct. at 849. In Ungar, the United States Supreme Court established the standard of review of a trial Court's denial of a motion for a continuance:

> The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel. Contrariwise, a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality. There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.

Ungar, 376 U.S. at 589, 84 S.Ct. at 849-50. (citations omitted). Petitioner has not established that he was prejudiced by proceeding with the trial in view of the delayed disclosure of evidence. Based on the foregoing, the undersigned finds that the trial Court's denial of Petitioner's motion for continuance was not so arbitrary or fundamentally unfair as to violate his right to a fair trial. The Respondent is entitled to summary judgment on Petitioner's third ground for relief.

## **PROPOSAL AND RECOMMENDATION**

Accordingly, the undersigned hereby respectfully **PROPOSES** that the District Court confirm and accept the foregoing findings and **RECOMMENDS** that the District Court **GRANT**

Respondent's Motion for Summary Judgment (Document No. 18.), **DISMISS** Petitioner's § 2254

Petition (Document No. 1.) and  remove this matter from the Court's docket.

The parties are hereby notified that this "Proposed Findings and Recommendation" is hereby

**FILED**, and a copy will be submitted to the Honorable Chief United States District Judge David A.

Faber. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rule

6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have thirteen days (ten days, filing

of objections and three days, mailing/service) from the date of filing of this Proposed Findings and

Recommendation within which to file with the Clerk of this Court specific written objections

identifying the portions of the Findings and Recommendation to which objection is made and the

basis of such objection. Extension of this time period may be granted for good cause.

Failure to file written objections as set forth above shall constitute a waiver of *de novo*

review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.

Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155, 106

S.Ct. 466, 475, 88 L.Ed.2d 435 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United

States v. Schronce, 727 F.2d 91, 94 (4th Cir.) cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81

L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, Chief Judge

Faber, and this Magistrate Judge.

The Clerk of this Court is directed to file this "Proposed Findings and Recommendation" and

to mail a copy of the same to counsel of record and to Petitioner, *pro se*.

ENTER: July 20, 2005.

R. Clarke VanDervort
United States Magistrate Judge

43